IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

CAROLYN ALLISON,                         )
                                         )
        Plaintiff,                       )
                                         )
v.                                       )     CIVIL ACTION NO. 16-0431-MU
                                         )
NANCY A. BERRYHILL,                      )
Acting Commissioner of Social            )
Security,[1]                             )
                                         )
        Defendant.                       )

## MEMORANDUM OPINION AND ORDER

Plaintiff Carolyn Allison brings this action, pursuant to 42 U.S.C. §§ 405(g)

and 1383(c)(3), seeking judicial review of a final decision of the Commissioner of

Social Security ("the Commissioner") denying her claims for Disability Insurance

Benefits and for Supplemental Security Income ("SSI"), based on disability. The

parties have consented to the exercise of jurisdiction by the Magistrate Judge,

pursuant to 28 U.S.C. § 636(c), for all proceedings in this Court. (Doc. 19 ("In

accordance with the provisions of 28 U.S.C. 636(c) and Fed. R. Civ. P. 73, the

parties in this case consent to have a United States Magistrate Judge conduct any

and all proceedings in this case, . . . order the entry of a final judgment, and

conduct all post-judgment proceedings.")). Upon consideration of the

administrative record, Allison's brief, the Commissioner's brief, and the arguments

---

[1] Nancy A. Berryhill has replaced Carolyn W. Colvin as acting Commissioner of
Social Security. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure,
Nancy A. Berryhill has been substituted as the defendant in this action. *See* 42
U.S.C. § 405(g).

of counsel at the May 10, 2017, hearing before this Court, it is determined that the Commissioner's decision denying benefits should be affirmed.[2]

## I.  PROCEDURAL HISTORY

Allison applied for a Period of Disability and Disability Insurance Benefits, under Title II of the Social Security Act, on May 17, 2013, and applied for SSI, based on disability, under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-1383d, on June 6, 2013. (Tr. 287-300). Her application was denied at the initial level of administrative review on August 28, 2013. (Tr. 225-36). On September 16, 2013, Allison requested a hearing by an Administrative Law Judge (ALJ). (Tr. 237-50). After a hearing on November 5, 2014, the ALJ issued an unfavorable decision finding that Allison was not under a disability from the date the application was filed through the date of the decision, May 29, 2015. (Tr. 108-29). Allison appealed the ALJ's decision to the Appeals Council, which denied her request for review of the ALJ's decision on June 17, 2016. (Tr. 1-6).

After exhausting her administrative remedies, Allison sought judicial review in this Court, pursuant to 42 U.S.C. §§ 405(g) and 1383(c). (Doc. 1). The Commissioner filed an answer and the social security transcript on November 21, 2016. (Docs. 11, 12). After both parties filed briefs setting forth their respective positions, the Court conducted a hearing on this matter on May 10, 2017. (Docs. 14, 15). The case is now ripe for decision.

---

[2]  Any appeal taken from this Order and Judgment shall be made to the Eleventh Circuit Court of Appeals. *See* Doc. 19 ("An appeal from a judgment entered by a Magistrate Judge shall be taken directly to the United States Court of Appeals for the judicial circuit in the same manner as an appeal from any other judgment of this district court.").

## II.  CLAIMS ON APPEAL

Allison raises three claims of alleged error made by the ALJ in her Decision:
1) the ALJ erred in failing to consider Allison's seven severe impairments in combination;

2) the ALJ erred in failing to link the Residual Functional Capacity (FRC) assessment to the evidence of record; and

3) the ALJ erred in failing to elicit vocational expert testimony regarding the RFC she assigned to Allison.

(Doc. 14 at p. 1).

## III. BACKGROUND FACTS

Allison was born on February 11, 1965, and was 48 years old at the time she filed her claim for benefits. (Tr. 27). Allison initially alleged disability due to left shoulder problems, left foot problems, degenerative joint disease, diabetes mellitus, neuropathy, hypertension, depression, back problems, sinus problems, and left eye problems. (Tr. 331). Allison graduated from Southside High School in 1982, and she completed college majoring in business management and minoring in computer science in 1988. (Tr. 136, 332). Allison has worked as a cook and a computer and cell phone programmer. (Tr.136-39). She engages in normal daily activities; such as, personal care, cooking meals, taking walks, going to scheduled doctor's appointments, visiting the elderly, and visiting with and helping her mother. (Tr. 341).

After conducting a hearing, the ALJ found that Allison had the following severe impairments: cervical and lumbar degenerative disc disease, mild degenerative joint disease of knee, diabetes mellitus, obesity, hypertension, right shoulder capsulitis, and status post subtalar fusion. (Tr. 113). She further determined that none of these impairments or combination of impairments met or equaled a listing. (Tr. 115). The ALJ assessed Allison's RFC and found that she could perform light work, with additional exertional, postural, environmental, and mental limitations. Taking into consideration these limitations, her age, education, and work experience, she found that Allison could perform work existing in the national economy. (Tr. 116-24). Accordingly, the ALJ concluded that Allison was not entitled to benefits. (Tr. 125).

## IV. ALJ'S DECISION

The portion of the ALJ's Decision that is relevant to the issues presented is as follows:

> **4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).**
>
> The claimant has cervical and lumbar degenerative disc disease, which is evaluated under *Medical Listing 1.04.* However the requirements of this listing are not met….
>
> The claimant's mild degenerative joint disease of knee is not a listed impairment. The undersigned has considered *Medical Listing 1.00B(1)* and the requirements are not met…. This provision of 1.02 and 1.03 notwithstanding, inflammatory arthritis is evaluated under 14.09. Under *Medical Listing 14.09,* the claimant does not experience repeated manifestation or inflammatory arthritis, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight

4

loss) and one of the following at the marked level: 1) limitation with activities of daily living, 2) limitation in maintaining social functioning, or 3) limitation with completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace.

The undersigned has reviewed the applicable listing for the claimant's diabetes mellitus *Medical Listing (9.00B5)*. As there is no specific listing for this impairment, based on the undersigned 's review of the evidence, her impairment does not meet or equal any listed impairment.

The undersigned has reviewed the applicable listing for the claimant's obesity *Medical Listing (1.00 Q)*. As there is no specific listing for this impairment, based on the undersigned' s review of the evidence, her impairment does not meet or equal any listed impairment.

The undersigned has reviewed the applicable listing for the claimant's hypertension *Medical Listing (4.00H J)*. As there is no specific listing for this impairment, based on the undersigned' s review of the evidence, her impairment does not meet or equal any listed impairment.

The claimant's right shoulder capsulitis is not a listed impairment. The undersigned has considered *Medical Listing 1.02* B and the requirements are not met, as the claimant does not experience significant inability to perform fine and gross movements effectively, as defined in 1.00B2c.

The claimant's status post subtalar fusion is not a listed impairment. The undersigned has considered *Medical Listing 1.02A* and the requirements are not met, as the claimant does not experience significant inability to ambulate effectively, as defined in 1.00B2b.

The undersigned has carefully considered the claimant's impairments. Per the totality of the evidence the claimant's impairments, singularly or combined, do not cause any listing level limitation.


**5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten pounds. She can sit, stand and walk for six hours in an eight-hour workday. She can occasionally push/pull with foot controls and hand controls. She can occasionally reach overhead with the right/left upper extremity and frequently reach**

**in all other directions with the right/left upper extremity. She can frequently handle and finger. She can occasionally climb ramps and stairs, but never climb ladders and scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She can never tolerate exposure to unprotected heights, moving mechanical parts, or operating a motor vehicle. She is limited with multiple work demands or rapid work changes. She can frequently interact appropriately with supervisors, coworkers, and the public.**

In making this finding, the undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

\* \* \*

The claimant testified that her date of birth is February 11, 1964, and she is 49-years-old. Her weight is 230 pounds. She is right handed. She is married and has three children who are all adults. The claimant's daughter lives with her and she works. The claimant has no income. Her family helps her out. They receive food stamps in the amount of $380 per month. She has a driver's license and she drives maybe twice a week. She said a friend brought her to the hearing today. She has a college degree in business management and a minor in computer science. She said that she worked as a prep chef for GMR Inc. She worked at Olive Garden as a prep chef.

She said that she worked prepping food in 2002-2003 at Club Court and Heritage Club. She worked at Fornic Inc. in 2005 cooking. In 2003-2006, she worked for a personnel service. She said that she tried going into business of opening a restaurant but it did not work out. She worked in 2011 as a cook at Vaughan Hospital.

The claimant said that she is diabetic. She was admitted to the hospital in July 2014 when her A1C was 14. *This is inconsistent with records from treating physician that shows that the claimant was admitted due to **left thigh abscess** (Exhibit B19F pg. 12).* She was discharged on July 30, 2014. She said that she was previously admitted in August 2013 with A1C of 14. She said that she was supposed to be on insulin but she could not afford it. Her medication is almost $400. She said that she has a company trying to help her get her medication. She has nerve pain in her feet and

her pain is about an eight on the pain scale of 0-10. Her pain feels like fire. She said that she broke her left foot in 2012 at work. She still has problems with her foot. She said that she can hardly stand on it. She said that her doctor said that she has arthritis in her knees and shoulders. She walks for 10-15 minutes a day. She lies down for about five hours in an eight-hour day. She keeps her feet elevated over her heart. She can walk about 100 feet before she has to stop and rest. She can stand for about 15-20 minutes and then her knees go out. She can sit for about 30-45 minutes. She cannot grip or pick up anything heavy with her left hand. She does not cook because she is unable to grip and she cannot pick up things with her left hand. She said that her eyes are getting bad and she is losing sight. The left eye is deteriorating. She can read a newspaper with glasses. She said that she has pain in her low back and her pain is about an 8 but on rainy days it is about a 9. She has pain at about an 8 in her right shoulder. She cannot reach overhead or hang out clothes. She can reach in front or to her side with pain. The undersigned finds the claimant's testimony is not fully credible.

The results of the magnetic resonance imaging (MRI) scan of the right knee taken on August 28, 2008, revealed minimal articular cartilage loss medial femorotibial compartment and mild medial meniscal degeneration (Exhibit B2F pg. 4).

The results of the MRI scan of the lumbar spine take on August 28, 2008, revealed mild degenerative disc disease mid lumbar spine with slight to mild foraminal stenosis but no focal disc protrusion or herniation (Exhibit B2F pg. 7).

The results of the MRI scan of the cervical spine taken on September 8, 2008, revealed mild mid cervical spine degenerative disc disease with foraminal stenosis but no focal disc protrusion or herniation (Exhibit B2F pg. 2).

On June 6, 2012, the results of the MRI scan of left ankle revealed degenerative changes within the anterior process of the calcaneus at the calcaneocuboid articulation, and posterior tendinopathy (Exhibit BIOF pg. 10).

Dr. Donald Thornbury, an orthopaedic surgeon, treated the claimant for left foot pain (Exhibits B9F, B11F). On September 6, 2012, the claimant was seen for persistent medial foot pain secondary to posterior tibia dysfunction. Dr. Thornbury noted that a couple of months ago, the claimant was scheduled for a subtalar fusion but it has taken to now to get approval for her surgery. She wanted to proceed and surgery was scheduled for this

coming Tuesday (Exhibit B9F pg. 14). She underwent a fusion and tendon transfer on September 11, 2012 (Exhibit B1OF pg. 6). The claimant continued to follow up with Dr. Thornbury from October 11, 2012 through January 2013. When seen on January 28, 2013, Dr. Thornbury noted that the claimant was five months out from her surgery. She had been out of her cast now for two months. *She reported overall pain pattern and swelling was significantly better.* Dr. Thornbury diagnosed satisfactory postoperative improvement. Dr. Thornbury planned to release the claimant to full duty and she was told to follow up in three months for a final visit. Dr. Thornbury opined that the claimant was at maximum medical improvement and released her with no restrictions (pg. 2).

* * *

The application for disability received on June 6, 2013, shows that the claimant alleged left shoulder, left foot, degenerative joint disease, diabetes, hypertension, depression, back, neuropathy, sinus, and left eye (Exhibit B3E). She noted her height as 5 feet 5 inches tall and her weight as 240 pounds. She is not working. She stopped working on July 1, 2011, because of her condition(s). The highest grade completed is four or more years of college in 1988. She noted specialized job training of sodering in 2005. She listed jobs in the last 15 years before she became unable to work as an assembly line worker, cook, and production worker.

The claimant completed a Function Report on June 29, 2013, indicating that she lives in an apartment with her family (Exhibit B4E). With daily activities, from the time she wakes up until going to bed, she checks her blood sugar, takes medicines, eats breakfast, walks around the neighborhood, visits with elders, goes to doctor's appointments, cooks, visits mother and helps her. She has problems with personal care of dressing, bathing, hair care, shaving, and using the toilet. She prepares her own meals. She does household chores of cleaning and laundry. She gets outside three times a week. She walks, drives, or rides a car. She goes out alone. She shops. She manages her finances. Her hobbies include watching TV and church. She goes to church and doctor's visits on a regular basis. Her illnesses are affected by lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, seeing, memory, completing tasks, concentration, following instructions, and using hands.

Richard S. Reynolds, Ph.D., Licensed Psychologist completed a consultative psychological evaluation on July 23, 2013 (Exhibit B15F).

* * *

8

The claimant stated that symptoms for depression began approximately four years ago. She reported panic attacks all the time. Dr. Reynolds noted that the claimant described her symptoms as happening "all the time." However, she refused to provide more specific information. *Dr. Reynolds opined that her symptoms were presented in a manner consistent with mild exaggeration of symptoms.* She reported a high school education and a BS in business management from Concordia University. She reported that she was employed at Vaughan Hospital as a dietary cook for one year. The claimant stated that she conducts activities of daily living autonomously. She reported that during the day she does nothing. She just sits in the house. She occasionally does a crossword puzzle or talks to the walls. She does not watch TV She reported that she has a driver's license but she does not drive. She attends church. She stated that her daughter does all the cooking, grocery shopping, housework, and management of finances. *However just one month prior to this evaluation, on June 29, 2013, the claimant noted in her Function Report that she walks around the neighborhood, visits with elders, goes to doctor's appointments, cooks, visits mother and helps her. She prepares her own meals. She does household chores of cleaning and laundry. She gets outside three times a week. She walks, drives, or rides a car. She shops. She manages her finances. Her hobbies include watching TV and church (Exhibit B4E).*

On mental status, the claimant was oriented to all spheres. Her mood was described as "I don't know sometimes mad, sometimes happy." Her affect was euthymic within normal limits for range and intensity. Her recent and remote memory was intact. Dr. Reynolds diagnosed major depressive disorder, mild and generalized anxiety disorder, NOS, mild. Dr. Reynolds opined that the claimant did not demonstrate appropriate effort on the sensorium and cognitive function portion of the evaluation. Dr. Reynolds opined that the claimant would have mild deficits in the ability to understand, remember, and carry out instructions in a work setting due to major depressive disorder, mild. She would have mild deficits in responding appropriately to supervisors, the public, coworkers, and routine work stressors in a work setting due to major depressive disorder, mild.

\* \* \*

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

In terms of the claimant's cervical and lumbar degenerative disc disease,

the undersigned finds this impairment is not as debilitating as alleged, as she has had limited treatment. Records from Selma Family Medicine Center show the musculoskeletal exam was normal in August 2014. When seen in September 2014, she had no complaints on review of system (Exhibit B19F). No physician has recommended or agreed to perform surgery. The claimant has not undergone extensive treatment of the kind customarily given for intractable pain such as epidural injections, a spinal cord stimulator implant, or a TENS unit. She does not participate in physical or other rehabilitative services for pain. She has not been referred for pain management evaluation. She has not been prescribed extensive narcotic or intramuscular or intravenous medications for pain.

With regard to mild degenerative joint disease of knee, the undersigned finds this impairment is not as debilitating as alleged. Records from Selma Family Medicine Center show the musculoskeletal exam was normal in August 2014. Her balance, gait, and stance were normal. The motor exam demonstrated no dysfunction. When seen in September 2014, she had no complaints on review of system (Exhibit B19F). The claimant has not undergone extensive treatment of the kind customarily given for intractable pain such as epidural injections. She does not participate in physical or other rehabilitative services for pain. She has not been referred for pain management evaluation. She has not been prescribed extensive narcotic or intramuscular or intravenous medications for pain. She has not required any surgical intervention and no physician has recommended or agreed to perform surgery.

With regard to diabetes mellitus, the undersigned finds this impairment is not as debilitating as alleged. She had significant compliance issues with medication and regularly checking her blood sugar. Specifically, when seen in February 2013 at Selma Family Medicine Center, she reported being out of medication for the past three weeks and no Lantus for more than a month (Exhibit Bl7F). Her follow up in May 2013, the claimant reported not checking her blood sugar at home and not taking her medications correctly (Exhibit Bl7F). However, when taking medications correctly, she had no significant problems. When seen in November 2013, she reported her diabetes symptoms were stable (Exhibit Bl7F). *The claimant had no emergency room visits, hospitalizations, unscheduled doctor's visits on a continuing basis, or referral to a specialist for the entire year of 2013 for this impairment.* When treated at Selma Family Medicine Center in July 2014, the claimant reported no medication in over a year for her diabetes. She also reported not checking her blood sugar (Exhibit Bl9F). She was restarted on medication and in August 2014, the claimant denied symptoms of nausea, vomiting, abdominal pain, or polydipsia (Exhibit Bl9F). The follow up in September 2014, shows the claimant reported

blood glucose in 130-140 range before breakfast which had improved from past readings (Exhibit Bl9F). Furthermore, there is no evidence of polydipsia, polyuria, retinopathy, polyneuropathy, or paresthesia often associated with prolonged uncontrolled diabetes mellitus.

In terms of the claimant's obesity, the claimant is 5 feet, 5 inches tall and weighs 240 pounds (Exhibit B3E). Her height and weight, in combination, represent a body mass index (BMI) of 39.9….These guidelines recognize three levels of obesity. Level I includes BMIs of 30.0-34.9. Level II includes BMIs of 35.0-39.9. Level III, termed "extreme" obesity and representing the greatest risk for developing obesity-related impairments, includes BMIs greater than or equal to 40. I have considered the impact of the claimant's obesity in exacerbating her problems and functional limitations caused by her other impairments. Although it is no longer a Medical Listing, obesity is considered along with other impairment in assessing limitation of functioning. We are instructed that an assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment. Individuals with obesity may have problems with the ability to sustain a function over time. "In cases involving obesity, fatigue may affect the individual's physical and mental ability to sustain work activity. This may be particularly true in cases involving sleep apnea." Furthermore, the combined effects of obesity with other impairments may be greater than might be expected without obesity. For example, someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from the arthritis alone (Social Security Ruling 02-1p).

With regard to hypertension, the undersigned finds this impairment is not as debilitating as alleged. In February 2013, she reported being out of medication for the past three weeks. Even without medications, her blood pressure was within an acceptable range of 125/85 (Exhibit Bl7F). She was restarted on medications. When seen for follow up at Selma Family Medicine Center in November 2013, the claimant reported that her symptoms were stable, but she ran out of antihypertensive medication recently. She reported no symptoms of headaches, fatigue, chest pain, palpitations, focal neurological deficits, dyspnea on exertion, paroxysmal nocturnal dyspnea, orthopnea, edema, or vision changes. Her follow up in July 2014, the claimant reported no medication in over a year and not checking her blood pressure (Exhibit B l9F). Her last visit at Selma Family Medicine Center in September 2014, her blood pressure was at an acceptable range of 111/76 (Exhibit B19F). She has not required any recent emergency room visits, unscheduled doctor's visits, hospitalizations, or referral to a specialist. Furthermore, there is no

evidence of a cerebral vascular accident or renal damage, generally associated with prolonged uncontrolled blood pressure.

With regard to right shoulder capsulitis, the undersigned finds this impairment is not as debilitating as alleged. In December 2013, she was prescribed medications and she was referred to physical therapy (Exhibit Bl 7F). There is nothing in the record to show that the claimant attended physical therapy for this impairment. In fact, she had no additional complaints about pain in her right shoulder when seen for follow up at Selma Family Medicine Center. Her follow up visit in August 2014 indicates a normal musculoskeletal exam (Exhibit B 17F pg. 7). The claimant has not required any additional treatment such as heat, corticosteroid injections, or anti-inflammatory medications for this impairment.

With regard to status post subtalar fusion, the undersigned finds this impairment is not as debilitating as alleged. Although, the claimant alleged at the hearing, pain at an eight on the pain scale of 0-10, with her foot, she never complained of pain at this level when treated by her doctor. In fact, in January 2013, she told Dr. Thornbury her overall pain pattern and swelling was significantly better. Dr. Thornbury placed the claimant at maximum medical improvement and released her with no restrictions (Exhibit Bl IF pg. 2). Three months later in April 2013, the claimant reported her original problem of posterior pain was better. Dr. Thornbury continued the claimant at full duty work (Exhibit B16F pg. 5). When seen in July 2013, by Dr. Thornbury, the claimant stated that her foot had overall gotten progressively better. Dr. Thornbury opined that the claimant does not require any additional surgery and he told her to try to find full duty work (Exhibit B16F pg. 4). There is no indication that the claimant required additional treatment including physical therapy or anti-inflammatory medications for this impairment.

As for the opinion evidence, the undersigned gives great weight to Dr. Reynolds ' opinion in Exhibit B15F. His opinion is supported by his own clinical examination and testing, and is consistent with the evidence of record as a whole.

The undersigned gives great weight to Dr. Harold R. Veits' mental assessment in Exhibit B3A because it is consistent with the record as a whole.

In sum, the above residual functional capacity assessment is supported by the available objective evidence treatment records, the claimant's activities, the available acceptable medical sources referred to herein, to the extent such as consistent with Finding of fact Number 5.

**10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).**

In determining whether a successful adjustment to other work can be made, the undersigned must consider the claimant's residual functional capacity, age, education, and work experience in conjunction with the Medical-Vocational Guidelines, 20 CFR Part 404, Subpart P, Appendix 2. If the claimant can perform all or substantially all of the exertional demands at a given level of exertion, the medical-vocational rules direct a conclusion of either "disabled" or "not disabled" depending upon the claimant's specific vocational profile (SSR 83-11). When the claimant cannot perform substantially all of the exertional demands of work at a given level of exertion and/or has nonexertional limitations, the medical-vocational rules are used as a framework for decisionmaking unless there is a rule that directs a conclusion of "disabled" without considering the additional exertional and/or nonexertional limitations (SSRs 83-12 and 83-14). If the claimant has solely nonexertional limitations, section 204.00 in the Medical-Vocational Guidelines provides a framework for decisionmaking (SSR 85-15).

If the claimant had the residual functional capacity to perform the full range of light work, a finding of "not disabled" would be directed by Medical-Vocational Rule 202.21. However, the claimant's ability to perform all or substantially all of the requirements of this level of work has been impeded by additional limitations. To determine the extent to which these limitations erode the unskilled light occupational base, the Administrative Law Judge asked the vocational expert whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and residual functional capacity. The vocational expert testified that given all of these factors the individual would be able to perform the requirements of representative occupations such as a tagger (DOT #794.687-058, light, unskilled, SVP 1) with 3,000 jobs in Alabama and 300,000 jobs nationally; inspector (DOT #559.687-074, light, unskilled, SVP 2) with 8,000 jobs in Alabama and 400,000 jobs nationally; and garment folder (DOT #369.687- 018, light, unskilled, SVP 2) with 3,000 jobs in Alabama and 200,000 jobs nationally.

Pursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information contained in the Dictionary of Occupational Titles.

Based on the testimony of the vocational expert, the undersigned concludes that, considering the claimant's age, education, work experience, and residual functional capacity, the claimant is capable of making a successful adjustment to other work that exists in significant numbers in the national economy. A finding of "not disabled" is therefore appropriate under the framework of the above-cited rule.

(Tr. 115-23, 124-25).

## V. DISCUSSION

Eligibility for DIB and SSI benefits requires that the claimant be disabled. 42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1)-(2). A claimant is disabled if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The impairment must be severe, making the claimant unable to do the claimant's previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-11. "Substantial gainful activity means work that … [i]nvolves doing significant and productive physical or mental duties [that] [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

In all Social Security cases, an ALJ utilizes a five-step sequential evaluation in determining whether the claimant is disabled:

(1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment; (3) if so, whether the severe impairment meets or equals an impairment in the Listing of Impairment in the regulations; (4) if not, whether the claimant has the RFC to perform her past relevant work; and (5) if not, whether, in light of the claimant's RFC, age, education and work experience, there are other jobs the claimant can perform.

*Watkins v. Comm'r of Soc. Sec.,* 457 F. App'x 868, 870 (11th Cir. 2012) (per curiam) (citing 20 C.F.R. §§ 404.1520(a)(4), (c)-(f), 416.920(a)(4), (c)-(f); *Phillips v. Barnhart,* 357 F.3d 1232, 1237 (11th Cir. 2004)) (footnote omitted). The claimant bears the burden of proving the first four steps, and if the claimant does so, the burden shifts to the Commissioner to prove the fifth step. *Jones v. Apfel*, 190 F.3d 1224, 1228 (11th Cir. 1999).

The reviewing court must determine whether the Commissioner's decision to deny benefits was "supported by substantial evidence and based on proper legal standards." *Winschel v. Comm'r of Soc. Sec.,* 631 F.3d 1176, 1178 (11th Cir. 2011) (citations omitted); *see* 42 U.S.C. § 405(g). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Winschel*, 631 F.3d at 1178 (citations omitted). "In determining whether substantial evidence exists, [the reviewing court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision." *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The reviewing court, however, "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [Commissioner]." *Id*. When a decision is supported by substantial evidence, the reviewing court must affirm "[e]ven if [the court] find[s] that the evidence preponderates against the Secretary's decision." *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986).

The Court will consider Allison's claims in the order presented.

## A. ALJ Erred in Failing to Consider the Seven Severe Impairments in Combination

The ALJ found that Allison had seven severe impairments: cervical and lumbar degenerative disc disease, mild degenerative joint disease of knee, diabetes mellitus, obesity, hypertension, right shoulder capsulitis, and status post subtalar fusion. (Tr. 113). Allison argues that the ALJ erred by not considering these seven severe impairments in combination. The ALJ addressed each of these impairments in detail and found that each did not meet or equal a listing. (Tr. 115-16). With regard to these impairments in combination, the ALJ found: "The undersigned has **carefully considered the claimant's impairments**. Per the totality of the evidence the claimant's impairments, **singularly or combined**, do not cause any listing level limitation." (Tr. 116) (emphasis added). Courts in this district have upheld language similar to the ALJ's here as "sufficient consideration of the effects of combinations of a claimant's impairments." *Pritchett v. Colvin*, Civ. A. No. 12-0768-M, 2013 WL 3894960, at * 4 (S.D. Ala. July 29, 2013) (citing *Jones v. Dep't of Health and Human Servs.*, 941 F.2d 1529, 1533 (11th Cir. 1991)); *accord Wilson v. Colvin*, Civ. A. No. 15-00428-N, 2016 WL 1734098, at * 9 (S.D. Ala. Apr. 29, 2016); *Norfleet v. Astrue*, Civ. A. No. 11-0482-M, 2012 WL 1605710, at *3-4 (S.D. Ala. May 7, 2012); *Godwin v. Astrue*, Civ. A. No. 07-0598-M, 2008 WL 552839, at * 4 (S.D. Ala. Feb. 26, 2008). This claim is without merit. *Id*.

## B.  ALJ Erred in Failing to Link the RFC Assessment to the Evidence

The ALJ found that Allison had the RFC to perform light work, except: "she can occasionally lift and/or carry twenty pounds and frequently lift and/or carry ten

pounds. She can sit, stand and walk for six hours in an eight-hour workday. She can occasionally push/pull with foot controls and hand controls. She can occasionally reach overhead with the right/left upper extremity and frequently reach in all other directions with the right/left upper extremity. She can frequently handle and finger. She can occasionally climb ramps and stairs, but never climb ladders and scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She can never tolerate exposure to unprotected heights, moving mechanical parts, or operating a motor vehicle. She is limited with multiple work demands or rapid work changes. She can frequently interact appropriately with supervisors, coworkers, and the public." (Tr. 116). According to Allison, the record contains no functional capacity assessment dated after the alleged onset date of April 12, 2013, by any treating, examining or even non-examining physician. She points to two consultative examinations that *predated* the alleged onset date that featured functional capacity assessments that do not support the ALJ's findings in support of her argument that the ALJ failed to link her RFC assessment to the evidence. At a consultative examination on December 2, 2008, Dr. Travis noted that Allison would have difficulty with extended standing, walking, lifting, and carrying. (Tr. 395-99). At a consultative examination on March 17, 2011, Dr. Combs stated that Allison could never lift over twenty pounds and never carry over ten pounds, that she could sit four hours at a time and eight hours total in an eight hour workday, that she could stand two hours at a time and four hours total in an eight hour workday, that she could walk thirty minutes at a time and two hours total in an eight hour work day, that she could never use her left hand for reaching, that she could

never climb stairs, ramps or ladders, that she could never balance, stoop, kneel, crouch, crawl, and that she could never be exposed to unprotected heights. (Tr. 532-39). Allison argues that, because there is no evidence that her condition improved after these examinations, the ALJ's RFC assessment does not link to the medical evidence of record.

However, the record reflects that after the 2008 and 2011 consultative reports relied on by Allison were generated, she underwent subtalar fusion surgery (September 2012) and reported improvement in her overall pain afterwards. (Tr. 117-18, 608, 611-12). Following surgery, Allison was released to full duty with no restrictions and got progressively better with time. (Tr. 118, 120, 621, 659). Unlike her examinations in 2008 and 2011, post surgery exams showed no musculoskeletal abnormalities and a normal gait. (Tr. 118, 121, 123, 703-04). Her treating physician encouraged her to find full-duty work. (Tr. 120, 659).

The ALJ is responsible for determining a claimant's RFC in light of the evidence presented. 20 C.F.R. 404.1546; *see also Green v. Soc. Sec. Admin.*, 223 F. App'x 915, 923 (11th Cir. 2007) (holding that "the ALJ will evaluate a [physician's] statement [concerning a claimant's capabilities] in light of the other evidence presented and the ultimate determination of disability is reserved for the ALJ); *Pritchett*, 2013 WL 3894960, at *5 (holding that "the ALJ is responsible for determining a claimant's RFC"). The ALJ's Decision pointed to evidence that demonstrated that Allison remained capable of performing a wide variety of physical activities. She reported on a functional capacity form on June 29, 2013 that on a typical day "she checks her blood sugar, takes medicines, eats

breakfast, walks around the neighborhood, visits with elders, goes to doctor's appointments, cooks, visits [her] mother and helps her." (Tr. 118). She also stated that she "prepares her own meals," "does household chores of cleaning and laundry," "gets outside three times a week," "walks, drives, or rides a car," "goes out alone," "shops," "manages her finances," and "watch[es] TV." (*Id*.). She further stated that "[s]he goes to church and doctor's visits on a regular basis." (Tr.118-19).

In addition, the ALJ thoroughly discussed that her medical examinations following her alleged onset date, April 12, 2013, were largely unremarkable and did not support more restrictive limitations than those contained in the RFC finding. For example, as noted above, the orthopaedic surgeon who operated on her left foot released her with no restrictions and to full duty work. (Tr. 117-120, 123). The ALJ noted that she had limited treatment for her back or her knee after her onset date, and all musculoskeletal exams, as well as her balance, gait, and stance, were normal. (Tr. 121). The majority of her treatment after the onset date was for follow-up on her diagnoses of hypertension and diabetes, which treatment showed no significant problems or limitations. (Tr.121-22). With regard to her complaint of right shoulder capsulitis, the ALJ noted that she was prescribed medication and physical therapy in December of 2013 and no other treatment after that date. (Tr. 123). The psychologist who performed an evaluation of Allison on July 23, 2013 diagnosed her with depression and generalized anxiety disorder and opined that she "would have mild deficits in the ability to understand, remember, and carry out instructions in a work setting" and

"mild deficits in responding appropriately to supervisors, the public, coworkers, and routine work stressors in a work setting." (Tr. 119).

"After careful consideration of the entire record," the ALJ found that Allison has the RFC to perform light work with some additional limitations. (Tr. 116). The Court finds that the ALJ did link her RFC assessment to the evidence and that her determination of Allison's RFC is supported by substantial evidence.

## C.  ALJ Erred in Failing to Elicit Vocational Expert Testimony Regarding the RFC

Allison argues that the ALJ erred because the hypothetical she posed to the vocational expert (VE) did not match the RFC she assessed. Specifically, the RFC indicates that Allison "**can occasionally** balance, stoop, kneel, crouch, and crawl." (Tr. 116) (emphasis added). However, in her hypothetical to the VE, the ALJ asked her to assume that the individual "**should not** be stooping, kneeling, crouching, and crawling." (Tr. 151) (emphasis added). Allison argues that the VE did not testify about what jobs would be available if an individual could occasionally kneel, crouch, or crawl; rather, the VE testified as to jobs available if an individual should not perform these activities. Allison correctly notes that "[i]n order for the testimony of a VE 'to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.'" *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002); *Jones v. Apfel*, 190 F.3d 1224, 1229 (11th Cir. 1999).

In this case, the hypothetical questions posed to the VE at the hearing were *more restrictive* than the RFC assessed by the ALJ. In response to the first

hypothetical, the VE identified available jobs of tabber (DOT# 794.687-058), inspector (DOT# 559.687-074), and garment folder (DOT# 369.687-018), all of which are light work, unskilled. (Tr. 151-52). The second hypothetical posed to the VE was whether there would be sedentary jobs with the same limitations available to Allison. (Tr. 152). The VE identified three more jobs with those restrictions: charge account clerk (DOT# 205.367-014), addressing clerk (DOT# 209.587-010), and table worker (DOT# 739.687-182). Even if giving a VE more restrictive parameters could be considered "error," such error would be harmless, and in fact, would favor the claimant.

Allison also argues that the ALJ's hypothetical question to the VE stated that the individual in question "should not stoop," and that the VE's testimony on the issue of available jobs in the absence of an ability to stoop is "inconsistent and invalid." Allison correctly notes that Social Security Ruling (SSR) 85-15 states that some stooping is required to do almost any kind of work. While that is true, it is also true that the ALJ found that she can occasionally stoop (Tr. 116). Moreover, according to the Revised Dictionary of Occupational Titles, at least one of the jobs identified by the VE, garment folder, requires no stooping. Therefore, this argument is also without merit.

Based on the foregoing, the Court finds that substantial evidence supports the ALJ's determination that jobs exist in the national economy that Allison can perform.

## CONCLUSION

As noted above, it is not this Court's place to reweigh the evidence or substitute its judgment for that of the Commissioner. It is well-established that this Court is limited to a determination of whether the ALJ's decision is supported by substantial evidence and based on proper legal standards. The Court finds that the ALJ's Decision that Allison is not entitled to benefits is supported by substantial evidence and based on proper legal standards. Accordingly, it is **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff benefits be **AFFIRMED**.

**DONE** and **ORDERED** this the **30th** day of **June, 2017**.

s/P. BRADLEY MURRAY
**UNITED STATES MAGISTRATE JUDGE**